Medical and Professional Services, Inc. v. Commissioner.
Medical & Professional Services, Inc. v. Commissioner
Docket No. 2747-63.
United States Tax Court
T.C. Memo 1965-238; 1965 Tax Ct. Memo LEXIS 90; 24 T.C.M. (CCH) 1211; T.C.M. (RIA) 65238; August 31, 1965
*90 Held, that the petitioner corporation is not entitled to deduct as ordinary and necessary expenses for its taxable year 1961, the respective sums of $6,000, $2,000 and $2,000 which it paid in said year to three individuals who at that time, or at least shortly prior thereto, held most of the corporation's shares of capital stock. Harold C. Knecht, Union Central Bldg., Cincinnati, Ohio, and Roy L. Struble, for the petitioner. George Tomlinson, for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined a deficiency of $3,000 in the income tax of the petitioner corporation for its taxable calendar year 1961. *91 The sole issue for decision is whether said corporation is entitled to deduct as ordinary and necessary business expenses for its taxable year 1961, the respective sums of $6,000, $2,000 and $2,000 which it paid in said year to three individuals who at that time, or at least very shortly prior thereto, held most of the corporation's shares of capital stock. Findings of Fact Some of the facts have been stipulated, and they are so found. The petitioner is an Ohio corporation that was incorporated on October 30, 1953. Its 1961 Federal income tax return was filed in the office of the district director of internal revenue at Cincinnati, Ohio. For several years prior to the creation of the petitioner corporation, Ashton L. Welsh who was a physician specializing in dermatology, practiced his profession as a sole proprietor at offices which he rented in the Carew Tower Building in Cincinnati. In these offices he had a considerable amount of office furniture, furnishings, leasehold improvements and professional equipment which were used by him and his staff and which he owned personally; and he also owned as of November 1, 1953, approximately $122,000 of accounts receivable from patients, *92 which were gradually being paid off by the patients through small payments. On said date of November 1, 1953, which was the day following the creation of the petitioner corporation in the manner and for the purposes hereinafter stated, he entered into a partnership agreement (the terms of which are not established by evidence herein) with one of the salaried physicians on his staff, named Mitchell Ede; and thereafter he and Ede set up a new set of professional accounts, and continued their professional practice in the same offices under the name of Welsh and Ede. Notwithstanding that Welsh apparently had an extensive and successful professional practice, he experienced what was described in the evidence as "enormous financial problems," and he was continuously short of cash. He died after the taxable year here involved and prior to the trial herein. The plan for forming the petitioner corporation was formulated by Welsh's attorney, Roy L. Struble; and the main purposes thereof - all of which purposes were thereafter given effect - were as follows: To have the corporation take over Welsh's lease for his professional offices in the Carew Tower Building; and to have said corporation *93 then sublease these premises back to the new partnership of Welsh and Ede, at a substantially greater rental; To have the corporation purchase from Welch for a total price of about $85,000 to be paid in recurrent deferred payments over a period of years, all of the office furniture, furnishings, leasehold improvements and professional equipment which Welsh and his staff were using in the above-mentioned offices; and then to have said corporation lease-back all the same to the new partnership of Welsh and Ede; and To have the corporation also purchase from Welsh, all of Welsh's accounts receivable from patients which were on hand as of November 1, 1953, for a total price that was substantially less than their face amount of about $122,000; and then to have the corporation deliver to Welsh, as recurrent payments on said purchase price, most of the collections thereafter received from the patients in respect of said accounts receivable. The capital stock of the petitioner corporation was represented by 50 shares of common stock and 100 shares of preferred stock - all of the par value of $100 per share; and these shares were issued in the names of the following persons, as follows: *94 Common Stock Shares
Ashton L. Welsh (above described)
20 shares
Evelyn Cogswell (a nurse in Welsh's
office, whom he married in May
1955)
10 shares
Roy L. Struble (Welsh's attorney)
10 shares
Ray A. Swink (who operated a serv-
ice for managing the accounts of
doctors under the name of Doctors'
Service Bureau, and who had been
handling Welsh's professional ac-
counts)
5 shares
Mildred M. Swink (wife of Ray A.
Swink)
5 shares
Preferred Stock Shares
Harry Bennett (owner of Ben-
nett Pharmacies, Inc. from whom
Welsh purchased his office drugs)
100 shares Swink was at all times the president; and Struble was at all times the secretary-treasurer. Welsh was never an officer, but the corporation was organized for his benefit and he dominated its activities. His new partner, Ede, was neither a stockholder nor an officer, and apparently never took part in the corporation's affairs. The evidence does not disclose the nature of the consideration paid by any of the above-named stockholders for their shares. Immediately after the corporation was organized, it borrowed $20,000 from a bank to provide it with operating funds. The petitioner corporation was, *95 at all times, a rather nebulous thing. It never had any clients other than Welsh and the Welsh and Ede partnership. The corporate address which it used on its income tax returns was that of the suite occupied by said Doctors' Service Bureau located in Suite 508, 24 East Sixth Street, Cincinnati; and it never had any separate office of its own, nor did it have any office furniture or equipment for its own use. Also, it never had any employees other than its elected officers; never paid any wages, or any salaries (at least prior to the disputed payment to Swink in 1961); and never declared any dividend to stockholders. The balance sheets set forth in its income tax returns showed that substantially its only assets, other than relatively small amounts of cash, were the office furniture, professional equipment, and patients' accounts receivable, which it had purchased from Welsh as aforesaid; and that substantially its only liabilities were sums owed to Welsh on the purchase price of said office equipment and patients' accounts receivable, plus relatively small amounts owed to a bank on a loan that it was paying off in installments. As regards its gross income, this consisted almost entirely *96 of the rentals which it received from subletting to the partnership of Welsh and Ede, the former professional offices of Welsh in the Carew Tower Building; the additional rentals from leasing to said partnership, the former office furnishings and professional equipment of Welsh; and profits derived from collections on Welsh's former accounts receivable from patients. And as regards the petitioner corporation's business expenses that were deducted on its income tax returns, substantially all of these consisted of the rent paid to the Carew Tower Building for the professional offices which it sublet to Welsh and Ede; depreciation on the office furniture and equipment which it had purchased from Welsh and leased back to said partnership; interest on bank loans; taxes and repairs; and fees paid to Swink's Doctors' Service Bureau, fees paid to attorney Struble, and other fees paid to an accountant for maintaining its corporate accounts and preparing its income tax returns. The manner in which the petitioner corporation's affairs were handled, was this. It had two bank accounts: One, called its regular business account, through which most of its above-mentioned gross income, expenses, *97 and payments to Welsh were handled; and another bank account, called a collection account but which was designated on its books as an Escrow Account, in which all collections from patients on Welsh's former accounts receivable were deposited prior to their allocation between Welsh and the corporation. All bills to patients in respect of the former accounts receivable of Welsh, and also all bills of the partnership of Welsh and Ede to its patients, were issued from the latter's partnership's office by a boookkeeper employed by said partnership; and thereafter, when payments were obtained from patients in respect of either of these types of accounts, said bookkeeper would receive them, credit the payments to the accounts of the particular patients, and then make daily deposits of all such receipts in the above-mentioned Escrow Account of the petitioner corporation. Subsequently, after said collections had been so received, credited and deposited, Swink in his capacity as operator of Doctors' Service Bureau would call at the offices of Welsh and Ede (usually in the evening); and there he would make an allocation of such collections between the partnership and the corporation, so that *98 appropriate transfers might be made to the respective separate accounts of each; and Swink also would sign all checks issued on either of the two above-mentioned bank accounts of the petitioner corporation. Also, an accountant named Alfred Scheidler to whom the petitioner corporation paid fees for his services, maintained petitioner's accounting records (the journals and ledger of which were all included in a single book); and he also annually prepared the petitioner's income tax return. By the end of the year 1957, all of Welsh's former accounts receivable from patients, which the petitioner corporation had purchased as aforesaid, were closed - principally through collections from the patients; in a few cases by charge-offs as bad debts; and through sale of the remainder to a commercial collection agency. From then on, petitioner derived most of its income from subletting Welsh's former offices to the partnership of Welsh and Ede, and from leasing Welsh's former office furniture and professional equipment to the same partnership. During the taxable year 1961 here involved, the petitioner corporation derived an unusual profit of approximately ten to twelve thousand dollars, which *99 has a relationship to the present controversy. The facts pertaining to this unusual profit are these. For several years, beginning sometime prior to 1958, Welsh was indebted to Harry Bennett (the person to whom all the preferred stock of the petitioner corporation had been issued) in the amount of $13,405.52. Bennett operated a pharmacy in the Carew Tower Building under the name of Bennett Pharmacies, Inc.; and the above indebtedness was for drugs supplied by his pharmacy to either Welsh or the partnership of Welsh and Ede. Bennett, for several years prior to 1961, had made repeated and insistent requests to Welsh for payment of this old account; but Welsh lacked sufficient cash with which to make payment. Bennett therefore continuously deferred taking other action for collection, not only because he had long been a close friend of Welsh but also because he wished to retain the business of the Welsh and Ede partnership which apparently was making prompt payment for its current purchases. Finally in 1960, Welsh made an offer to Bennett to settle this old account for a reduced amount of $10,000, which Bennett refused; and thereupon attorney Struble entered the scene and formulated a *100 plan, which Bennett accepted, under which the latter received in the fall of 1960, a cash payment of $11,000. The manner in which such plan operated and the petitioner corporation derived its above-mentioned unusual profit in 1961, was as follows: In about November 1960, a check of the petitioner corporation in said amount of $11,000 was delivered to Bennett; and on petitioner's books of account this amount was charged: $10,000 to its preferred stock account, to reflect a redemption of the 100 shares of preferred stock that had been issued to Bennett at the time when petitioner was incorporated; and $1,000 to an asset account, to reflect payment for an assignment by Bennett to the petitioner corporation of the above-mentioned old account receivable which Bennett had been attempting to collect from Welsh. Thereafter in December 1961, the petitioner corporation collected from Welsh and Ede, the full amount of said old account receivable for $13,405.52 which it had taken over from Bennett at a cost per books of $1,000; and it thereby realized a profit of over $12,000. Shortly thereafter in December 1961, petitioner made payments to Welsh, to Struble and to Swink in the respective *101 amounts of $6,000, $2,000 and $2,000, which petitioner here contends are deductible by it as ordinary and necessary business expenses for its taxable year 1961. The petitioner corporation, at all times maintained its books of account and filed its Federal income tax returns on a calendar year basis and in accordance with an accrual method of accounting. As regards Welsh, he at no time was an officer or employee of the corporation; and he performed no services for said corporation in the year 1961. Also in April of that year, which was about 6 months before said $6,000 payment was made to him, he and his wife transferred to his wife's sister, Ruth C. Leugers, all of the 30 shares of common stock which had been issued to them when the petitioner corporation was organized in 1953. The circumstances of this transfer, and the consideration therefor if any, have not been established in the evidence. As regards Struble, he had performed legal services in the capacity of an attorney for the petitioner corporation in connection with its incorporation in 1953; in 1958 in connection with certain tax controversies; and in 1960 in connection with various matters including the transaction regarding *102 Bennett's account above mentioned. Since the year 1954 his law office had been located in Florida; and his services for each of the years above mentioned had been promptly billed by him to the petitioner corporation through invoices or letters in which his fees were specified by him. These fees were accrued by petitioner as business expenses on its income tax returns for said years. The final invoice of this character was issued by Struble in 1960; it provided specifically for additional legal services for all years 1955 through 1960, plus certain traveling expenses; it was accrued by petitioner as a business expense of the year 1960; was paid in full in April 1961; and was deducted by petitioner on its 1960 income tax return, without any portion thereof being disallowed by respondent. Struble performed no services for the petitioner corporation in 1961. As regards Swink, the petitioner corporation paid to his Doctors' Service Bureau for his services (none of which was performed by any of his employees) annual fees for all years from the time of its incorporation through at least the year 1961 here involved; and all of these fees (which are unrelated to the above-mentioned $2,000 *103 paid to him in 1961) were separately accrued, paid and deducted by the petitioner corporation for the respective years for which said services were rendered. Swink rendered no additional services for petitioner in the year 1961 in respect of the said amount of $2,000 here involved, and there is no evidence of any corporate action authorizing payment of any salary. Each of said payments of $6,000 to Welsh, $2,000 to Struble, and $2,000 to Swink which were paid to them in December 1961 after petitioner had realized the above-mentioned unusual profit in that month, were proportional to the number of shares of petitioner's capital stock which were held in the names of Welsh and his wife, Struble, and Swink and his wife, at the time when the above-mentioned transaction with Bennett was effected in the fall of 1960. The respondent, in his notice of deficiency herein, determined that none of the lastmentioned payments to Welsh, Struble and Swink was deductible by the petitioner corporation for its taxable year 1961, under section 162(a)(1) or any other section of the Internal Revenue Code. Opinion The petitioner corporation had the burden of establishing error in the above-mentioned *104 determination of the respondent - disallowing any deductions to it for the taxable year here involved in respect of the payments made in that year to Welsh, Struble and Swink in the respective amounts of $6,000, $2,000, and $2,000. We hold that petitioner has failed to sustain that burden. Moreover, after considering and weighing all the evidence herein, we are convinced beyond any reasonable doubt, and we here further hold, that none of said amounts qualify as ordinary and necessary expenses of petitioner in respect of any services which any of said individuals rendered to petitioner. As regards Welsh, the only activity relating to the corporation in which he participated, was the 1960 settlement with Bennett. And this was, in reality, merely a settlement for his benefit of a past due account for which he personally was liable; which attorney Struble testified could have been handled by Welsh personally; but which Welsh and Struble decided to handle, instead, through the instrumentality of the petitioner corporation. Welsh performed no service whatever for petitioner during the taxable year here involved. As regards Struble, the only services which the evidence reveals that he *105 performed for the petitioner corporation were legal services rendered in his capacity as an attorney (and not as an officer) in years prior to 1961; and these attorney's services were separately billed, accrued, paid, and deducted for the particular taxable years in which the same were performed. As regards Swink, we are convinced that the services which he rendered to the petitioner were rendered in his capacity as operator of his Doctors' Service Bureau; and such services (like those of Struble) had also been separately and annually billed to, accrued, paid and deducted by the petitioner corporation for the particular taxable year involved. We are not persuaded that he performed any additional services in 1961 which were worth $2,000; that any such amount was authorized by corporate action; or that the $2,000 which was paid to him in December 1961 was intended to be compensation for services as an officer. If it were necessary to characterize such payment to Swink, we would say that it was nothing more than a distribution to him as a stockholder, of a share of the unusual profit realized by petitioner in 1961. The same would clearly be true with respect to the similar $2,000 *106 payment to Struble; and we think likewise it would be true as regards the $6,000 payment to Welsh. The amount which Welsh received is exactly proportional to the stock ownership of him and his wife at the time the Bennett transaction was effected; and the evidence in this record does not convince us of the bona fides of the transfer of the stock by him and his wife to his wife's sister, shortly before the payment to him was made. We decide the present issue for the respondent. Decision will be entered for the respondent.